**AFFIDAVIT IN SUPPORT OF AN APPPLICATION FOR A
<u>CRIMINAL COMPLAINT AND ARREST WARRANT</u>**

I, Rebecca Shaw, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I seek a criminal complaint charging JAREH SEBASTIAN DALKE ("DALKE")
with three counts of attempting to transmit national defense information to an officer or agent of
a foreign government, in violation of Title 18, United States Code, Section 794(a).

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), a position
I have held since July 2009.  As an FBI Special Agent, I have received training at the FBI
Academy located in Quantico, Virginia, including training on investigative methods and training
specific to counterintelligence and espionage investigations.  I am currently assigned to a squad
at the FBI Denver Field Office, Counterintelligence Division, where I primarily investigate
counterintelligence matters.  As an FBI Special Agent, I have conducted or participated in
witness and subject interviews, physical surveillance, service of subpoenas, the execution of
search and arrest warrants, the seizure of evidence, including computer, electronic, and e-mail
evidence, as well as requested and reviewed pertinent records.  Based on my experience and
training, I am familiar with the requirements for the handling of classified documents and
information.  I am also familiar with the methods used by individuals engaged in the unlawful
use or disclosure of classified information.  As a federal agent of the United States, I am
authorized to investigate violations of the laws of the United States.

3.      The facts in this affidavit are based on my personal observations, my training and
experience, and information obtained from other agents, U.S. Government personnel, and
witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for
the requested warrant and does not set forth all of my knowledge about this matter.  Where I

have reported statements made by others, or from documents that I have reviewed, those statements are summarized, unless otherwise noted.

4.      Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 794(a), have been committed by DALKE.

## JURISDICTION AND VENUE

5.      As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within the District of Colorado.

## STATUTORY AUTHORITY AND DEFINITIONS

6.      Under 18 U.S.C. § 794(a), "Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government . . . or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly . . . any document . . . or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life . . . ."

7.      Under Executive Order 13526, information in any form may be classified if it: (1) is owned by, produced by or for, or is under the control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order [Top Secret, Secret, and Confidential]; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security.

2

8.      Where such unauthorized disclosure could reasonably result in damage to the national security, the information may be classified as "Confidential" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in serious damage to the national security, the information may be classified as "Secret" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in exceptionally grave damage to the national security, the information may be classified as "Top Secret" and must be properly safeguarded.

9.      Sensitive Compartmented Information ("SCI") means classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems.

10.      Classified information may be marked as "Not Releasable to Foreign Nationals/Governments/Non-US Citizens," abbreviated "NOFORN," to indicate information that may not be released in any form to foreign governments, foreign nationals, foreign organizations, or non-U.S. citizens without permission of the originator.

11.      Classified information may also be marked as "Originator Controlled," abbreviated "ORCON."  This marking indicates that dissemination beyond pre-approved U.S. entities requires originator approval.

12.      Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know."  Among other requirements, in order for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to and must agree to properly protect classified information

3

by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations.  If a person is not eligible to receive classified information, classified information may not be disclosed to that person.  In order for a foreign government to receive access to classified information, the originating United States agency must determine that such release is appropriate.

13.     Pursuant to Executive Order 13526, classified information contained on automated information systems, including networks and telecommunications systems, that collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that: (1) prevents access by unauthorized persons; and (2) ensures the integrity of the information.

14.     32 C.F.R. Parts 2001 and 2003 regulate the handling of classified information. Specifically, 32 C.F.R. § 2001.43, titled "Storage" regulates the physical protection of classified information.  This section prescribes that Secret and Top Secret information "shall be stored in a GSA-approved security container, a vault built to Federal Standard (FHD STD) 832, or an open storage area constructed in accordance with § 2001.53."  It also requires periodic inspection of the container and the use of an Intrusion Detection System, among other things.

## PROBABLE CAUSE

15.     As set forth in further detail below, between on or about August 1, 2022, and September 26, 2022, DALKE, a former employee of the National Security Agency ("NSA"), using a particular email account ("Email Account-1"), communicated with an FBI Online Covert Employee ("OCE") and sent the OCE excerpts of three (3) classified documents and one (1)

4

classified document in its entirety, in exchange for payment.  The excerpts and the full document contained classification markings and other markings that associated them with three agencies within the U.S. Government ("USG Agency-1," "USG Agency-2," and "USG Agency-3").  During the course of the communications from Email Account-1 to the OCE, the user of Email Account-1 expressed his belief that he was communicating with an individual associated with a particular foreign government ("Foreign Government-1"), a country with many interests that are adverse to the United States.

16.     I believe that DALKE is the user of Email Account-1.  Specifically, NSA records regarding historical user activity on NSA systems reflect that DALKE printed each of the three classified documents, excerpts of which the OCE received from Email Account-1, as well as the full classified document which the OCE received from Email Account-1.  DALKE was the only NSA employee to have printed all of these documents.

17.     Further, on August 9, 2022, the same day that DALKE provided a cryptocurrency[1] address to the OCE for payment, DALKE opened an account in his true name at a particular cryptocurrency exchange.  After receiving payment in cryptocurrency from the OCE, DALKE deposited a similar amount of the same type of cryptocurrency in this exchange account.  On the same day, DALKE converted the cryptocurrency to U.S. dollars ("USD") and

---

[1] Cryptocurrency is a type of virtual currency that is not issued by any government, bank, or company, but is instead controlled through computer software operating via a decentralized, peer-to-peer network.  There are thousands of types of cryptocurrencies.  Cryptocurrency is sent to and received from virtual "addresses" and can be accessed from many types of electronic devices, including laptop computers and smartphones.  An address is somewhat analogous to a bank account number and is represented as a case-sensitive string of letters and numbers.

withdrew the USD from the cryptocurrency exchange.  Approximately three (3) days later, the same amount of USD that DALKE withdrew from his cryptocurrency exchange account was deposited to DALKE's account at a bank with multiple branch locations in Colorado.

18.     DALKE is a resident of Colorado Springs, Colorado.  On or about September 18, 2022, DALKE requested that the OCE set up a mechanism for DALKE to digitally transfer additional sensitive information in Denver, Colorado.  DALKE, who has never conveyed his location to the OCE other than to state that he is not currently in the Washington, D.C. area, expressed a willingness to travel to Denver to complete the transfer of sensitive information DALKE claimed to have taken while employed at the NSA.  DALKE proposed to transfer that information on September 28 or 29, 2022.

### DALKE's Background

19.     DALKE obtained his B.S. in Cybersecurity and Information Assurance from Western Governor's University in 2019.  DALKE's resume also reflects that he has a Master's Degree from Norwich University where his studies included a research focus on cyber policy and technical vulnerability analysis and that he is pursuing his Doctorate at American Military University with a research focus on cyber affairs and advanced persistent threats.  DALKE's resume claims he has elementary proficiency in Russian and Spanish.  DALKE also claims to have cyber-related certifications, including as a Certified Information Systems Security Professional and a Certified Cyber Crime Investigator.  Based on my training and experience and conversations with other law enforcement officials, I know that an individual with a background in cybersecurity would be knowledgeable about secure methods of communication, including encrypted email services such as the provider of Email Account-1.

6

20.     DALKE was a member of the U.S. Army from approximately 2015 to 2018. DALKE served as an E-3 Private First Class, Military Occupational Specialty 68W Health Care Specialist, and held a Secret security clearance, which he received in 2016.  While with the U.S. Army, DALKE's security clearance granted him the ability to access materials classified up to the Secret level.  Based on my training and experience, I know that individuals who hold security clearances receive training on the proper handling of classified information.

21.     Beginning on June 6, 2022, DALKE became a civilian employee of the NSA, where he served from June 6, 2022 to July 1, 2022.  During this time, DALKE was an Information Systems Security Designer and was assigned to an NSA facility in the Washington, D.C. metro area.  As required for his assignment at the NSA, DALKE held a Top Secret security clearance, which took effect upon his entry on duty to the NSA in June 2022.  To acquire his security clearance, DALKE signed a lifetime binding non-disclosure agreement.  In that agreement, DALKE acknowledged that "all protected information to which I may obtain access hereafter, is and will remain the property of the United States Government unless and until otherwise determined by an appropriate official or final ruling of a court of law."  DALKE also acknowledged that the "failure to return such materials may be a violation of Section 793 of Title 18, United States Code."  DALKE further acknowledged that "the unauthorized disclosure of protected information may invoke the criminal sanctions prescribed by one of more of the following statutes Sections 793, 794, 798, 952, and 1924 of Title 18."

22.     In addition to DALKE's Top Secret clearance, he maintained sensitive compartmented access (SCI) to other highly classified programs.  In his indoctrination memoranda, DALKE acknowledged that "THE NEED FOR SPECIAL PROTECTION OF THIS

7

MATERIAL WAS MADE KNOWN TO ME, AND I WAS REMINDED THAT ACCECSS TO THIS MATERIAL IS GOVERNED BY THE TERMS OF THE NSA SECURITY AGREEMENT THAT I HAVE PREVIOUSLY SIGNED."

23.     While at the NSA, DALKE also received training on his duty to protect classified materials from unauthorized disclosure, which included complying with handling, transportation, and storage requirements.  In particular, DALKE was advised that the unauthorized disclosure of Top Secret information reasonably could be expected to cause exceptionally grave damage to the national security of the United States and that a violation of the rules governing the handling of classified information could result in criminal prosecution.

24.     DALKE submitted his resignation to the NSA on June 28, 2022, and was debriefed from his TS//SCI clearance on July 1, 2022.  On July 1, 2022, DALKE also signed a termination statement in which he agreed that, "even though my authorized access to NSA is hereby terminated, I continue to be obligated . . . to preserve and safeguard the security of protected information."  DALKE also acknowledged that he was required to return "to the government all protected information to which I may have obtained access during the course of my employment or other service with the NSA."

25.     On or about, June 28, 2022, on his exit survey from the NSA, DALKE stated, "I had to leave due to a family illness and the agency was unable to support the amount of time I needed to be away (9 months)."

26.     According to U.S. Government databases, DALKE currently has an inactive U.S. Government security clearance, which means that DALKE is not permitted to have access to classified information.

27.     While employed by the NSA, DALKE listed his address as a residence in Colorado Springs, Colorado where FBI has observed him to be living, and provided a telephone number with area code (703).  DALKE purchased this residence in 2020 jointly with RESIDENT-1, and he maintains a mortgage on the property.  DALKE stated he was in a civil marriage, legally recognized civil union, or legally recognized domestic partnership with RESIDENT-1 in his Electronic Questionnaires for Investigations Processing (e-QIP) during his background check for employment with the NSA.  Your affiant believes that DALKE currently resides at this residence with RESIDENT-1 because DALKE owns that property, listed that address in his e-QIP during his background check for his employment with the NSA, and FBI Surveillance has frequently observed DALKE and RESIDENT-1 at the residence in September 2022, including as recently as September 27, 2022.

28.     In addition, according to court filings, on December 12, 2017, DALKE filed for Chapter 7 bankruptcy, which was granted on March 29, 2018.  At that time, DALKE reported that he had approximately $32,809.52 in student loan debt and $50,987.34 in other non-secured debt, primarily credit card debt.  At the time of the bankruptcy filing, DALKE also reported that he had approximately $8,373.12 in total assets.

29.     DALKE has served as a volunteer with the Colorado Rangers, a volunteer law enforcement reserve group, which supports law enforcement agencies throughout Colorado. DALKE's resume lists his current role as a Lieutenant and Commander of the Digital Crimes Unit in the Colorado Rangers and says he performs duties as a sworn and POST-certified ("Peace Officer's Standards and Training") Colorado peace officer and supervisor.  His listed skills include: performing and supervising investigations that have a digital nexus, to include

network intrusions, forensics, and information-system enabled fraud.  His resume also states that he has specialized training with federal law enforcement related to digital forensics and incident response, dark web investigations, open source intelligence, and advanced persistent threats.

### DALKE Communicates with the OCE

30.     On or about July 29, 2022, using an email account set up for this purpose, the OCE sent an email to Email Account-1, which had been set up through a particular foreign email provider (hereinafter "Foreign Email Provider").  Based on my training and experience, I know that the Foreign Email Provider offers its users a combination of public-key cryptography and symmetric encryption protocols to offer end-to-end encryption, which means that only the sender and intended recipient can read the email messages in plain text.  Although the Foreign Email Provider is a legitimate company, I know from my training and experience that cybercriminals often use the Foreign Email Provider both because of the extra anonymity that encryption offers and because the location of the provider means that the Foreign Email Provider is not required to comply with U.S. legal process.

31.     In his email, the OCE stated, in sum and substance, that he had been informed that he should reach out to Email Account-1 to discuss items of mutual benefit.

32.     DALKE responded to the OCE on or about August 1, 2022, and requested that their communications continue through the Foreign Email Provider.  Two days later, in response, the OCE agreed to use the Foreign Email Provider and asked, "What do you propose?"

33.     DALKE responded the same day and expressed his belief that he was communicating with a representative of a foreign government, noting that he "recently learned that my heritage ties back to your country, which is part of why I have come to you as opposed

to others."  DALKE also stated that he was an employee of the U.S. government and that he put

in for the position he was currently in because he had "questioned our role in damage to the

world in the past and by mixture of curiosity for secrets and a desire to cause change."

34.     DALKE told the OCE that he had "exfiltrated some information that is of a very

high level."  He added that he was on a temporary assignment that does not allow him access to

such information, but that he planned to return to a position that would give him access to

information originating from both the NSA and USG Agency-2.  DALKE also noted that certain

of the information he had access to was due to a misconfiguration in the system that granted him

access to information beyond what he should otherwise have.  DALKE described the information

he had access to as relating to foreign targeting of U.S. systems and information on cyber

operations, among other topics.

35.     DALKE further noted that he was in financial need and was seeking

compensation via a specific type of cryptocurrency in return for providing information he had

procured, stating, "[t]here is an opportunity to help balance scales of the world while also

tending to my own needs."  DALKE requested payment in the specific type of cryptocurrency

because "as in these things privacy is extremely important."

36.     On or about August 5, 2022, the OCE thanked DALKE and asked him for proof

of access in order to determine proper compensation.

### DALKE Transmits National Defense Information to the OCE

37.     On or about August 6, 2022, DALKE transmitted excerpts of three documents to

the OCE (hereinafter "Excerpt 1," "Excerpt 2," and "Excerpt 3"), each of which contained

classification markings.  Excerpt 1 is the cover page and table of contents of a threat assessment

of Foreign Government-1's military offensive capabilities.  Excerpt 2 relates to USG Agency-1's

plans to update a certain cryptographic program.  Excerpt 3 is USG Agency-3's threat

assessment of sensitive U.S. defense capabilities, a portion of which relates to Foreign

Government-1.  Subject matter experts ("SMEs") reviewed each of the excerpts and determined

their classification level.  The excerpts received by the OCE also contained numbering, which

were not original to the documents, as indicated below:

| Excerpt Title | Excerpt Classification Level (as determined by SME) |
|---|---|
| 1-1 | SECRET//REL TO USA//FVEY |
| 1-2 | UNCLASSIFIED |
| 2-1 | UNCLASSIFIED//FOUO |
| 2-2 | TOP SECRET//SCI |
| 2-3 | SECRET//NOFORN |
| 2-4 | TOP SECRET//SCI//ORCON//NOFORN |
| 3-1 | SECRET//NOFORN |
| 3-2 | TOP SECRET//SCI |

38.     DALKE stated that he was providing the Excerpts to demonstrate both his

"legitimate access and willingness to share" and further noted that the excerpts were just a "small

sample to what is possible."

39.     As discussed above, the NSA conducted an internal audit to determine who at the

NSA accessed the three specific documents, excerpts of which DALKE provided to the OCE.

Although other users accessed and/or downloaded at least one of the three documents on the

NSA's system, NSA records reflect that only one user, DALKE, had printed all three of the

unique documents.  DALKE printed the first document on June 17, 2022, the second document

on June 23, 2022, and the third document on June 22, 2022.  NSA records also reflect that DALKE printed the full classified document which he provided to the OCE.

40.     After receiving Excerpts 1-3, the OCE requested that DALKE send his preferred cryptocurrency address.  As noted above, DALKE had previously told the OCE that he wished to be paid in specific type of cryptocurrency.  On or about August 9, 2022, DALKE provided his cryptocurrency address.

41.     DALKE also told the OCE that his temporary assignment should end in April 2023.  As noted above, DALKE previously asserted that he was scheduled to return to a position with the NSA where he could access additional information from Intelligence Community agencies.  I know from my discussions with the NSA that when DALKE left the NSA in July 2022, he told the NSA that he needed approximately 9 months off to address a situation with his family, after which he would like to return to employment with the NSA.  April 2023, which is when DALKE told the OCE that he would return to a position with the NSA, is approximately 9 months after DALKE left his original period of employment with the NSA.

42.     On or about August 10, 2022, prior to any transfer of cryptocurrency or response from the OCE, using Email Account-1, DALKE, in a stated effort to prove he also had access to USG Agency-2 information, transmitted a USG Agency-2 document containing information relating to a foreign government leader.  DALKE, still believing the OCE to be a foreign government representative, said that he was providing the full document as a "show of good faith" that he was "willing to provide full documents without reservation."  The document DALKE transmitted is four (4) pages long and is classified as SECRET//NOFORN, which means both that the U.S. government determined that the document could not be shared with

non-U.S. persons or entities and that the unauthorized disclosure of the document could cause serious damage to the national security.  An Original Classification Authority at USG Agency-2 has determined that the fourth document contains classified information and is properly marked as being classified as SECRET//NOFORN.

43.     DALKE may be seeking to access additional national defense information by regaining employment with the NSA.  On or about August 11, 2022, DALKE applied to an external vacancy at the NSA.  On August 24, 2022, NSA's Human Resources Department, which was unaware of the investigation into DALKE due to the sensitivity of the investigation, conducted a telephonic interview with DALKE wherein DALKE expressed his desire to return to the NSA.  To date, the NSA has not extended an offer of further employment to DALKE.

**DALKE Receives and Deposits Payment for the Information He Transmitted**

44.     On or about August 22, 2022, the OCE responded to DALKE that the OCE would be transmitting the requested cryptocurrency very soon.  The OCE also noted that DALKE's continued cooperation would be a great service to individuals in the country of Foreign Government-1.  On or about August 23, 2022, DALKE responded, "This is great news!"  Using the cryptocurrency address DALKE provided, on or about August 24, 2022, the OCE deposited approximately 0.64053413 units of the requested cryptocurrency, worth approximately $99.90 USD,[2] in DALKE's account to make sure the address worked.  DALKE confirmed receipt of the cryptocurrency on or about the same day.

---

[2] Because the value of cryptocurrency is subject to significant fluctuations, the estimated USD value of the cryptocurrency is based on the amount of the particular cryptocurrency that was transferred at the closing exchange rate the day the transfer occurred.

45. In addition, in two emails on or about August 23 and 24, 2022, DALKE requested that the OCE take steps to verify that the person DALKE was communicating with was truly a member of Foreign Government-1. DALKE claimed that he had reached out through "multiple published channels to gain a response. This included submission to the SVR TOR site."[3] DALKE sought assurances that the OCE truly was a "[Foreign Government-1] entity rather than americans [sic] trying to stifle a patriot." DALKE requested that the OCE provide verification of the association with Foreign Government-1, through a posting on an official website or through a report in one of the "media services associated with the government."

46. On or about August 25, 2022, the OCE submitted a second payment to DALKE of approximately 30.77804805 units of the cryptocurrency, worth approximately $4,818.04 USD, and explained the same day that the payment was a good faith payment to help with DALKE's debts. DALKE confirmed receipt of the transfer but expressed his belief that the documents would be "valued more highly." DALKE further stated that he "will have to find alternative means to remove my debt in the near future so that it does not threaten my employment . . . ."

47. On or about August 26, 2022, DALKE told the OCE that the total amount of his debt was $237,000, $93,000 of which was "coming due very soon." Accordingly, DALKE requested $85,000 in return for all the information currently in his possession. He said he would be "happy to chip away at the amount that remains with additional future information shared to you." DALKE expressed his belief that the information in his possession would be of value to

---

[3] The SVR, or Foreign Intelligence Service, is the Russian government's external intelligence agency. TOR, short for "The Onion Router," is an open-source software that conceals an internet user's location and usage by directing Internet traffic through a relay network.

Foreign Government-1 because certain of the information specifically related to Foreign Government-1 and other information related to highly classified U.S. systems that Foreign Government-1 would be interested in.

48.     On or about August 26, 2022, DALKE transferred 31.4185 units of the cryptocurrency he received to an account with Kraken, a cryptocurrency exchange that allows customers to trade cryptocurrencies for other assets including U.S. dollars.  Information provided to law enforcement reflects that the account into which the cryptocurrency was transferred was created by DALKE on August 9, 2022.  To create the account, DALKE provided: (i) his name; (ii) an email address beginning, "jdalke"; (iii) an address in Colorado Springs, Colorado, which is a mailbox at a UPS store I know to be associated with DALKE; (iv) a telephone number, which is the same telephone number that DALKE provided the NSA in his employment materials; (v) a copy of his passport card, which shows DALKE's name, picture, and passport card number; (vi) a Social Security Number (SSN) that matches what I know to be DALKE's SSN; and (vii) a photo which shows the same individual listed on DALKE's passport card, and which I recognize to be DALKE.

49.     On the same day that DALKE transferred 31.4185 units of the type of cryptocurrency he requested from the OCE to Kraken, DALKE converted the cryptocurrency to U.S. dollars.  DALKE's Kraken account shows that the value of the cryptocurrency at the time of the transfer was $4,628.21.  My review of public records indicates that the dollar value of the cryptocurrency DALKE received fluctuated between -1% and -6% between August 25, the day DALKE received the second, larger, cryptocurrency payment, and August 26, the day DALKE converted the cryptocurrency to USD.  Accordingly, the approximately 4% decrease between the

dollar value of cryptocurrency DALKE received from the OCE and the dollar value of the cryptocurrency that was deposited in DALKE's Kraken account and ultimately in DALKE's bank account, is the likely result of a decrease in the value of the cryptocurrency between the time DALKE received the cryptocurrency and the time it was deposited.  In addition, account records also reflect that Kraken charged a fee of $68.40 for the conversion, leaving $4,559.81 in DALKE's account.  Approximately five minutes after converting the cryptocurrency to USD, DALKE's account records reflect a withdrawal of $4,559.81 from his Kraken account.

50.     On or about August 29, 2022, financial records reflect that $4,559.81 from Kraken was deposited into an account held by DALKE at a bank with multiple locations in Colorado.

### DALKE Prepares to Transmit Additional Information to the OCE

51.     To allow for the secure transfer of additional documents to which DALKE claimed to have access, the OCE established a secure, digital connection that would allow DALKE to transfer the remaining materials in his possession and told DALKE that the digital connection would be set up in the Washington, D.C., area.  However, DALKE told the OCE that he was not currently in the D.C. area and did not want to disclose his current location for fear of the NSA being able to discern his identity.  Although DALKE expressed his desire to "provide the documents as soon as possible," he expressed concern about his travel being monitored and asked the OCE how close he would need to be to the digital connection to perform the transfer.

52.     DALKE also expressed his belief that "[t]his country it is not as great as it thinks it once was.  It is all about the businesses and their money, not anything about the people or

those that serve it to include the military." As noted above, I know that DALKE previously served in the U.S. Army as an E-3 Private First Class.

53.     On or about August 29, 2022, the OCE again suggested the Washington, D.C., area as the ideal location to digitally and securely receive the documents, but also said that the digital drop might be able to be set up in another location and asked DALKE where he could travel without being monitored.

54.     On or about September 5, 2022, the OCE sent approximately 71.81389817 units of cryptocurrency worth approximately $11,422.53 USD to DALKE and explained that $2,000 was for travel expenses to the Washington, D.C. area and the remainder was in return for the USG Agency-2 document. The OCE also emphasized that there was an urgency to receiving the documents because of the current "world situation."

55.     On or about September 9, 2022, DALKE confirmed receipt of the cryptocurrency. DALKE again expressed hesitation to travel to the Washington, D.C. area. On or about September 18, 2022, DALKE asked the OCE whether the OCE would be able to set up the secure connection at either the Cherry Creek Mall or City Park in Denver, Colorado, on September 28 or 29, 2022. DALKE, who has represented to the OCE throughout their communications that he remains employed by the U.S. Government but at a "field site" – a fact I know to be false – told the OCE that he would be eligible to travel with his job to attend a program at a facility in Denver. Your affiant knows that DALKE resides in Colorado Springs, Colorado, which is approximately seventy (70) miles from Denver.

56.     With respect to the information he would be willing to provide, DALKE told the OCE, "If the Americans ever get this information I am afraid it will make obvious who has

18

shared this information, but if you can get approval for this last accommodation I am sure I can get you the documents quickly." DALKE stated that, in the future, he will "be back in Washington and will not need special arrangements again."

57.     On or about September 19, 2022, the OCE told DALKE to be prepared to be in Denver on September 28 or 29, as DALKE had requested, and that additional instructions would follow. On or about September 20, 2022, DALKE sent an email to the OCE with subject line "Confirmation" stating:

> I received the final approval at work and the travel is being arranged. I confirm I will be available on the days stated and will wait to receive the transfer information when available.
>
> I look forward to finally get [sic] you this information and the benefit it will bring. I am glad this arrangement was possible.

58.     On or about September 23, 2022, the OCE informed DALKE that a secure digital connection would be available for a period of four hours on September 28, 2022. The OCE instructed DALKE to standby for the specific location.

59.     On or about September 25, 2022, DALKE and RESIDENT-1 traveled from Colorado Springs to an Ikea store in Centennial, Colorado, where they spent approximately 45 minutes. DALKE and RESIDENT-1 subsequently traveled to the Park Meadows Mall in Lone Tree, CO, where they spent approximately 45 minutes. DALKE and RESIDENT-1 subsequently traveled to the Cherry Creek Mall, one of the two locations that DALKE proposed as a location to pass information via the OCE's secure connection. DALKE and RESIDENT-1 spent approximately 2.5 hours in and around that location.

60.     On or about September 26, 2022, DALKE sent an email to the OCE stating that DALKE would "wait for the instruction."  In that same email, DALKE requested a signal "to help verify you are serving [Foreign Government-1] before the transfer."  Later that same day, the OCE responded and explained that the signal DALKE requested was not possible, but assured him that many precautions had been taken.  In that same email, the OCE provided the unique information DALKE would need to access the secure connection and instructed DALKE to go to Union Station in downtown Denver, Colorado, on September 28, 2022, between 11:30 a.m. and 3:30 p.m. to complete the transmission.

61.     The FBI has currently made arrangements that will allow DALKE to transmit any information in his possession via a secure connection from the vicinity of Union Station during the time period provided to DALKE.  The FBI will be monitoring the connection and the location.  Based on prior representations made to the OCE and my consultations with USG Agencies-1, 2, and 3, I believe that, should DALKE arrive at Union Station on September 28, he will transmit classified and national defense information.

//

//

//

20

## CONCLUSION

62.     In summary, based upon the above facts and information, I submit that there is

probable cause to believe that JAREH SEBASTIAN DALKE has violated Title 18, United States

Code, Section 794(a).


Respectfully submitted,


_s/ Rebecca Shaw_
Rebecca Shaw
Special Agent
Federal Bureau of Investigation


**Submitted, attested to, and acknowledged by reliable electronic means this  27th   day of
September, 2022.**

N. REID NEUREITER
UNITED STATES MAGISTRATE JUDGE


**Affidavit reviewed and submitted by Assistant United States Attorney Julia K. Martinez.**